IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| CHRISTOPHER CURTIS KELLEY, ) | |
| ) | |
| Movant, ) | |
| ) | |
| v. ) | Case No. 16-4274-CV-C-BP |
| ) | Crim. No. 12-04043-01-CR-C-BP |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

**ORDER AND OPINION DENYING MOTION TO
VACATE, SET ASIDE OR CORRECT SENTENCE
AND DENYING A CERTIFICATE OF APPEALABILITY**

Pending is Christopher Kelley's Motion to Vacate, Set Aside or Correct Sentence, (Doc. 1), which seeks relief pursuant to 28 U.S.C. § 2255. For the following reasons, the Motion is **DENIED**, and the Court declines to grant a Certificate of Appealability.

**I. BACKGROUND**

The Court will summarize the facts and the procedural history, but will not set forth all of the evidence introduced at trial. Details will be provided as necessary to discuss Movant's claims.

Movant was charged with two counts of arson. The first charge arose from a fire in a classroom at the Audrey Webb Child Study Center on the campus of Stephens College. An investigation after this fire revealed that a computer had been taken from the classroom where the fire started. Testimony offered at trial established that the computer was disconnected from the system around the time of the fire.

The second charge arose from multiple fires on the first floor of the Ellis Library at the University of Missouri – Columbia ("MU"). The fires were set early in the morning on

September 10, 2011, after the building had been locked. In the aftermath it was discovered that various pieces of property (e.g., a window, a camera, a sprinkler head, computer screens etc.) had been destroyed. In addition, on the fourth floor – where no fires had been started – feces and urine were found on one of the desks. MU police initially preserved the feces but disposed of it the same morning, (Crim. Doc. 84, p. 15)[1], after concluding its preservation was unnecessary. (Crim. Doc. 72, pp. 108-09 (Trial Transcript, pp. 212-13).)

The fire department's investigation revealed multiple trigger points for the fire. Security officers at MU reviewed security videos that depicted a figure walking through the library after it had been closed and locked. The figure was seen walking in the areas where the fires had been set, and the videos depicted no other figures. Law enforcement publicized still photos from the videos and received at least two calls identifying Movant as the person in the pictures. Shortly thereafter, Movant went to the MU police department and admitted that he was the person depicted in the pictures, but he did not admit to setting the fires.

Movant was indicted on the two counts of arson on June 27, 2012. An Arraignment and Detention Hearing was held on July 3, 2012, and at that time Movant was represented by Troy Stabenow of the Federal Public Defender's Office. (Crim. Doc. 8.) The trial took place in April 2013, with Stabenow as Defendant's counsel.

At trial, Julie Rogers – the Assistant Head of Security at Ellis Library – testified that she reviewed the videotapes from the library's security cameras for the time frame from 8:15 p.m. on September 9 (the time the library was locked for the night) to 4:15 a.m. on September 10 (the time the police arrived) to determine if the cameras recorded a person in the library after it was locked. (Crim. Doc. 72, p. 45 (Trial Transcript, p. 149).) She testified that the cameras picked

---

[1] "Crim. Doc. ___" is a reference to a document in the criminal case.

up a person in the library and Exhibit 99 was a disc containing a copy of all of the surveillance videos from the period 8:15 p.m. on September 9 to 3:25 a.m. the next day. Rogers terminated copying at 3:25 a.m. (instead of extending it to the time police arrived) because that was when the person seen in the video exited the library. (Crim. Doc. 72, p. 49 (Trial Transcript, p. 153).) Thus, Exhibit 99 included the entire time period Rogers viewed except the seven to eight minutes between the last time the trespasser was seen on a video and when officers arrived on the scene. (Crim. Doc. 85, p. 9.)

The Court admitted Exhibit 99 into evidence, (Crim. Doc. 72, p. 50 (Trial Transcript, p. 154)), and portions of the videos were played for the jury. (Crim. Doc. 72, pp. 51-55, 57-66, 70 (Trial Transcript pp. 155-59, 161-70, 174).) Still pictures taken from the videos were also admitted into evidence and shown to the jury. (Crim. Doc. 72, pp. 53-56, 58-66 (Trial Transcript, pp. 157-60, 162-70).) In many instances it could be clearly discerned that Movant was the person on the videos; moreover, when he went to the MU police department Movant was wearing the same clothes as the figure in the videos. In addition to the videotape of Movant in the Ellis Library and Movant's admissions to the MU police, other evidence against Movant included: (1) the computer stolen from Stephens College was found in Movant's apartment, (2) an ex-girlfriend testified that Movant admitted to her that he stole a computer from Stephens College and in the process might have started a fire, (3) his roommates testified that Movant admitted that he had been in the Ellis Library, (4) the surveillance tapes did not reveal anybody else in the Ellis Library after it was locked, and (5) as the sprinklers in the Ellis Library were triggered, Movant was seen in the area at approximately the same time – thereby suggesting that he was in the vicinity of each fire as it started. The jury convicted Movant on both counts.

In July 2013, Movant sought to proceed *pro se* and requested that Stabenow seek leave to withdraw. The Motion to Withdraw was granted on July 31, 2013. (Crim. Doc. 80.) On August 22, 2013, Jennifer Wirsching entered her appearance on Movant's behalf, (Crim. Doc. 82), and she represented him at sentencing. Movant was sentenced to 78 months on both counts, with the sentences to run concurrently; this represented the top of the range recommended by the Sentencing Guidelines. Movant appealed, and he was represented by different counsel on appeal. The only issues raised on appeal related to decisions prior to July 2013 in which the Court declined to replace Stabenow as Movant's trial counsel or failed to permit Movant to represent himself. The Court of Appeals addressed the issues in two separate opinions, the combined effect of which was to affirm the convictions. *United States v. Kelley,* 787 F.3d 915 (8th Cir. 2015); *United States v. Kelley,* 774 F.3d 434 (8th Cir. 2014).

Unbeknownst to the Court until July 2013, (*see* footnote 6, *supra*), Stabenow was an adjunct professor at the MU School of Law. He taught a class during the fall semesters in 2012, 2013, and 2014 and was paid $4,000 per semester. (Doc. 10-1.)

Movant presents four reasons for setting aside his conviction, but the last two are related and will be combined for purposes of discussion. He argues that (1) his Due Process rights were violated when the feces found in the Ellis Library was destroyed, (2) his Due Process rights were violated because the video introduced at trial was incomplete and of low-quality, and (3) Stabenow operated under a conflict of interest by representing Movant on charges of committing arson at MU while at the same time working as an adjunct professor at MU. The Government contends (1) Movant's Due Process rights were not violated when the feces was destroyed, (2) arguments about the videotape constitute claims of trial error that are not cognizable in a § 2255

proceeding, and (3) Stabenow did not have a conflict of interest and Movant's Sixth Amendment rights were not violated. The Court resolves these arguments below.

## II. DISCUSSION

### A. Destruction of the Feces

Movant contends that the destruction of the feces violated his Due Process rights because it could have been tested to demonstrate that another person was in the Ellis Library on the night in question, thereby exonerating Movant. The Government argues that the destruction of the feces did not violate the standards set forth in *Youngblood v. Arizona,* 488 U.S. 51 (1988) and *California v. Trombetta,* 467 U.S. 479 (1984).

The Court first considers Movant's claims under *California v. Trombetta. Trombetta* held that the duty to preserve evidence "must be limited to evidence that might be expected to play a significant role in the suspect's defense." To meet this standard, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." 467 U.S. at 488-49.

The exculpatory value of the feces was discussed at a hearing before trial. At Movant's request, Stabenow sought to have the feces tested; he then learned that the feces had been destroyed the morning of the fires. However, as discussed during the hearing, the feces had limited evidentiary value even if DNA testing proved that it was not Movant's. The fires were set (and Plaintiff was seen) on the first floor, while the feces was left on the fourth floor. Therefore, as Stabenow explained, "in order for our defense to be successful, we have to come up with an alternate explanation for how the fires could have happened[, so] our focus has to be on the first floor. . . . [E]ven assuming that we can show the feces belonged to somebody else,

5

the Government response could be, well, some student went there and played a practical joke before the library closed that night and nobody noticed. It's not going to negate the arson case unless we can deal with the evidence on the first floor." (Crim. Doc. 84, p. 10.) Thus, *Trombetta* does not apply here because the exculpatory value of the feces was not apparent: the MU police did not know (1) whether the feces was left by the arsonist or (2) whether it could be linked to Movant.

Because the exculpatory value of the feces was not apparent, *Youngblood* applies. In *Youngblood,* the Supreme Court contrasted *Trombetta* and held that "the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood,* 488 U.S. at 57. In such a situation, the defendant must demonstrate (1) that "the evidence . . . had apparent exculpatory value and comparable exculpatory evidence must not have been reasonably available to the defendant," and (2) bad faith on the part of the government. *United States v. Webster,* 625 F.3d 439, 446 (8th Cir. 2010). Absent these showings, the "failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood,* 488 U.S. at 57.

As discussed above, the feces did not have exculpatory value that was apparent to the MU police. Even if it was proven that Movant did not defecate on the fourth floor of the library, this fact would not disprove the charge that he set fires on the first floor. Critical to this conclusion are the facts that (1) even if another person defecated, there was no way to determine *when* it occurred, and (2) video surveillance confirmed that Movant was in the locations when and where the fire occurred – and nobody else was.

Further, bad faith has not been established. Movant relies solely on the failure to preserve the feces and contends that its exculpatory value was so apparent that bad faith is the only possible explanation for its destruction. As discussed above, the exculpatory value was not apparent. Regardless, the bad-faith requirement cannot be satisfied merely by advancing the speculative possibility that the material in question might be exculpatory. Bad faith requires "official animus towards [the defendant] or a conscious effort to suppress exculpatory evidence." *Trombetta,* 467 U.S. at 488. If bad faith could be established merely because evidence was destroyed, the requirement would be effectively eliminated. Here, no showing of bad faith has been made. Testimony presented at trial demonstrates that the feces was not saved and tested because it was deemed unnecessary (probably in light of the availability of evidence from the surveillance cameras). Given the limited evidentiary value of the feces and the other evidence available this assessment appears reasonable – but at worst, this assessment was negligent and does not evince the bad faith necessary to satisfy *Youngblood*.

This discussion leads to a related point: the lack of prejudice to Movant. In *United States v. Davis,* the Eighth Circuit held that a defendant asserting a Due Process claim premised on the destruction of potentially exculpatory material must also demonstrate prejudice. "[A]n assessment of the nature and degree of the prejudice resulting from the evidence must be made in light of the overall strength of the government's case. To cause substantial prejudice, the absence of the [evidence] must impair the fairness of the trial." 690 F.3d 912, 923 (8th Cir. 2012).[2] Here, for the reasons stated, Movant was not prejudiced by the failure to preserve and test the feces. Nothing compels the conclusion that the arsonist and the defecator had to be the

---

[2] *Davis* was vacated by the Supreme Court and remanded for reconsideration of the sentencing issues set forth in *Alleyne v. United States,* 133 S. Ct. 2151 (2013). On remand, the Eighth Circuit held that "any *Alleyne* error in this case is harmless" and affirmed. *United States v. Davis,* 736 F.3d 783, 785 (8th Cir. 2013), *cert. denied,* 135 S. Ct. 64 (2014). It thus appears that *Davis*'s discussion of *Youngblood* and *Trombetta* remains valid and binding on this Court.

7

same person: the events occurred in different places, and could have occurred at different times. Therefore, proving Movant was not the source of the feces would not disprove that he set the fires. Moreover, given the evidence against Movant, the outcome of the trial would not have been different even it was established that Movant did not defecate on the fourth floor of the library.

Under the facts of this case, the untested feces did not have apparent evidentiary value, much less exculpatory value. The failure to preserve the feces for future DNA testing was not the product of bad faith. Finally, given the evidence against him and the feces' limited evidentiary value, Movant was not prejudiced by its destruction. For these independent reasons, the Court concludes Movant's Due Process rights were not violated.

### B. Videotapes

Movant next contends the low quality of the videotapes constituted a Due Process violation. He also discusses the videotape's completeness, but his argument on this point does not specify the nature of his allegation. Regardless, Movant's arguments regarding the videotape do not justify relief.

First, the Government contends the claim is not cognizable because it could have been raised on direct appeal. "[S]ection 2255 is not a substitute for direct appeal, and matters which could have been raised on appeal will not be considered." *United States v. Samuelson,* 722 F.2d 425, 427 (8th Cir. 1983) (citing *United States v. Sappington,* 527 F.2d 508, 508–09 (8th Cir. 1975)).[3] This includes not only claims of trial error, but all claims that could be raised on direct appeal. *See, e.g., Costa v. United States,* 996 F.2d 1221, *1 (8th Cir. 1993) (Table) (claim that

---

[3] There is an exception when a litigant can show cause and prejudice for the failure to raise the issue on appeal. *E.g., Jennings v. United States,* 696 F.3d 759, 762-63 (8th Cir. 2012). However, Movant does not raise any argument that would excuse the failure to raise these issues on appeal.

indictment did not specify subsection giving rising to charge not cognizable in § 2255 proceeding); *Lagerquist v. United States,* 820 F.2d 969, 971 n.5 (8th Cir. 1987) (challenge to sufficiency of the indictment could not be raised for first time in § 2255 proceeding). Thus, regardless of whether Movant is challenging the sufficiency of the evidence, an evidentiary ruling, a discovery violation, or is raising an argument related to the completeness of the videos, his arguments are foreclosed because he failed to raise them on direct appeal.[4]

With respect to Movant's arguments regarding the videos' completeness, the Court makes an additional point. Regardless of what aspect of completeness he challenges, he would not be entitled to relief. To the extent that he contends only portions of Exhibit 99 were played to the jury, his claim lacks merit because the Government was not obligated to play the entirety of Exhibit 99 for the jury. Movant remained free to show the jury any additional portions of Exhibit 99 he deemed appropriate. To the extent Movant contends Exhibit 99 does not contain the seven to eight minutes from the time Movant left the building until the police arrived, there was no value to those portions of the videos. Finally, during the trial it was established that Stabenow "sought video camera footage out in the surrounding area around the Ellis Library" and this video was not preserved. (Crim. Doc. 72, p. 151 (Trial Transcript, p. 255).) If this is basis for Movant's claim, it lacks merit. Given the evidence establishing Movant's presence *inside* the library when (and where) the fires were set, video from *outside* the library is of marginal value at best.

Movant's arguments predicated on the completeness or quality of the video could have been raised on direct appeal, and Movant's failure to do so precludes his assertion of those

---

[4] This point could apply to the issue addressed in Part II.A, but the Government did not raise it in that context.

9

arguments in a § 2255 proceeding. Regardless, his arguments lack merit. Accordingly, Movant's arguments related to the videos do not justify postconviction relief.

### C. Conflict of Interest/Ineffective Assistance of Counsel

Movant's final arguments both arise from Stabenow's work as an adjunct professor at the MU law school. Movant contends that Stabenow was simultaneously (1) representing him on a charge of arson at MU while (2) working for MU. This, according to Movant, violated his Sixth Amendment right to counsel, either because this situation constituted ineffective assistance of counsel or a conflict of interest. The Government argues that this situation does not constitute a conflict of interest, and Movant has not established the requirements for a finding of ineffective assistance of counsel.

"A defendant's claim that he was denied effective assistance of counsel because his attorney labored under a conflict of interest is considered under several different standards. To establish ineffective assistance of counsel, a defendant typically has to demonstrate that his counsel's performance was deficient and prejudicial." *Noe v. United States,* 601 F.3d 784, 789 (8th Cir. 2010). This is the standard set forth in *Strickland v. Washington,* 466 U.S. 668 (1984), and it "requires [the applicant] to show that his 'trial counsel's performance was so deficient as to fall below an objective standard of reasonable competence, and that the deficient performance prejudiced his defense.'" *Nave v. Delo*, 62 F.3d 1024, 1035 (8th Cir. 1995), *cert. denied*, 517 U.S. 1214 (1996) (quoting *Lawrence v. Armontrout*, 961 F.2d 113, 115 (8th Cir. 1992)). The analysis contains two components: a performance prong and a prejudice prong. Failure to satisfy both prongs is fatal to the claim. *E.g., Pryor v. Norris*, 103 F.3d 710, 713 (8th Cir. 1997); *see also DeRoo v. United States*, 223 F.3d 919, 925 (8th Cir. 2000). However, if there is a conflict of interest, the defendant need not demonstrate deficient performance or prejudice. Under

*Cuyler v. Sullivan,* 446 U.S. 335 (1980), "[a] defendant who timely raises a claim of conflict of interest arising from joint representation is entitled to automatic reversal in the absence of a finding that no conflict existed. If the defendant did not raise the conflict of interest at trial, the defendant must show an actual conflict of interest that affected the adequacy of his representation." *Noe,* 601 F.3d at 789. These burdens are not as demanding as those required by *Strickland.*

The Government contends that *Strickland* applies and *Cuyler* does not because (1) Stabenow did not have a conflict of interest and (2) even if he did, it is not the sort of conflict that will trigger *Cuyler.* The Court cannot agree with the first argument. The Government avers that Stabenow as "not an employee of the law school, but rather an adjunct professor who taught one class." (Doc. 5, p. 11.) The Government continues by pointing out that MU is a large institution that has produced a large number of graduates, and if Stabenow had a conflict of interest, then "half the lawyers in mid-Missouri, most of whom have some tangential connection to the University of Missouri – Columbia, would have such a conflict." (Doc. 5, pp. 11-12.) The Government's observations do not address the facts of this case. The Court agrees that a lawyer would not have a conflict because he graduated from MU, volunteered his time or donated money to the university, or had some other undefined "tangential connection" to MU. And it is not merely the case that Stabenow was an adjunct professor at MU. The problem is that Stabenow performed work for one of Movant's victims in exchange for money at the same time he was representing Movant.[5] Under these circumstances, the issue is not as clear as the Government suggests, and solely for the sake of argument the Court will presume that Stabenow had a conflict of interest. This does not mean, however, that *Cuyler* applies to *this* conflict of

---

[5] The Court does not find it relevant that Stabenow thought the $4,000 he was paid per semester was "very small" and was less than what he could have done performing additional work for the Army. (Doc. 10-1, p. 1.) $4,000 is not a token sum.

11

interest. The Court of Appeals has acknowledged that "[i]n this circuit, it is unclear whether we limit application of *Cuyler* to conflicts involving multiple or serial representation." *Covey v. United States,* 377 F.3d 903, 907 (8th Cir. 2004); *see also Winfield v. Roper,* 460 F.3d 1026, 1039 (8th Cir. 2006). The Court deems it unnecessary to determine whether *Cuyler* or *Strickland* applies because Movant cannot prevail under either standard.

No objection was raised at trial and there was no basis for the Court to conduct an inquiry *sua sponte*, so "*Cuyler* requires that [Movant] demonstrate that the conflict adversely affected his lawyer's performance." *Covey,* 377 F.3d at 908.[6] To do this, he must identify "some actual and demonstrable adverse effect on the case, not merely an abstract or theoretical one," but an adverse effect "is not the equivalent of prejudice." *Id.* (quotation omitted). Then, he must demonstrate that the conflict caused to attorney to make choices that led to an adverse effect on the case. *Id*. Movant identifies three purportedly adverse effects that he attributes to Stabenow's conflict of interest: (1) Stabenow "failed to efficiently argue the spoilage of exculpatory evidence," namely, the feces, (2) communication issues between Stabenow and Movant, and (3) the failure to challenge Exhibit 99 on the ground that it was a copy and not the original. (Doc. 7, pp. 12-13.) The Court holds these are insufficient to satisfy *Cuyler.* The Record establishes that Stabenow requested that the feces be tested and learned it was destroyed before Stabenow was involved in the case. During the trial, Stabenow elicited evidence that the feces had been

---

[6] Movant has submitted an statement in which he avers that he knew of Stabenow's status as an adjunct professor shortly after Stabenow was appointed, and that he "attempted to put the Court on notice of my concern with the conflict of interest." (Doc. 7-1, ¶¶ 1, 4.) He provides no citation for his efforts, and the Court finds no record of such an attempt before July 31, 2013. Movant filed materials complaining about Stabenow, but none asserted that Stabenow had a conflict of interest. (Crim. Doc. 22, 56.) The issue also was not raised during the December 10, 2012 hearing before the Magistrate Judge, which addressed Movant's concerns about his attorney. (Crim. Doc. 84.) The first mention of the issue the Court can find is on July 31, 2013, in connection with (and during) the hearing held after the trial that addressed Movant's motion to proceed *pro se.* (Crim. Doc. 78, p. 3; Crim. Doc. 86, p. 25.) And, the Eighth Circuit was lead to believe that Movant did not learn about Stabenow's status as an adjunct professor until after the trial was over, *Kelley,* 774 F.3d at 439 n.6, although the Court does not know what persuaded the Court of Appeals to reach this conclusion. Regardless, the Record does not demonstrate that the issue was raised in this Court before July 2013.

destroyed before it could be tested and presented an argument based on this fact to the jury. (*See* Crim. Doc. 73, p. 20 (Trial Transcript, p. 301).) Movant does not suggest what more Stabenow could have done. The communication issues Movant describes are not an "adverse" decision within the meaning of *Cuyler*; they are the product of the fact that Movant generally made demands on Stabenow that Stabenow was not legally obligated to fulfill. Finally, contrary to Movant's claim, an excerpted copy of a videotape can be authenticated and introduced into evidence. In short, Movant has not identified any adverse effect that can be attributed to the fact that Stabenow was paid to teach a class at MU at the same time he represented Movant.[7]

Movant fares no better under *Strickland*. *Strickland*'s prejudice requirement presents a higher standard than the adverse effect required by *Cuyler*, so for the reasons set forth above Movant cannot prevail under *Strickland*. Moreover, Movant has not specifically identified anything Stabenow did (or failed to do) that would constitute deficient performance, so Movant cannot satisfy either of *Strickland*'s prongs.

The Court accepts, solely for the sake of argument, that Movant's trial attorney operated under a conflict of interest. However, Movant cannot demonstrate that the conflict adversely affected his attorney's performance, nor can he demonstrate that he was denied effective assistance of counsel. Accordingly, even if there was a conflict of interest, Movant is not entitled to postconviction relief.

## D. Certificate of Appealability

In order to appeal Movant must obtain a Certificate of Appealability, which should be issued only if he "has made a substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This showing is established if reasonable jurists could disagree as to how

---

[7] Movant cannot attribute the failure to raise issues on appeal, (*see* note 3, *infra*), to this conflict because Stabenow did not represent Movant on appeal.

the issue should be resolved. *Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003). The Court does not believe that the issues Movant has raised are subject to debate among reasonable jurists, so the Court declines to issue a Certificate of Appealability.

### III.  CONCLUSION

The Motion for Postconviction Relief is **DENIED** and the Court declines to issue a Certificate of Appealability.

**IT IS SO ORDERED.**

|  |  |
|---|---|
|  | /s/ Beth Phillips |
|  | BETH PHILLIPS, JUDGE |
| DATE: April 10, 2017 | UNITED STATES DISTRICT COURT |